**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 15-1827
_____

UNITED STATES OF AMERICA

v.

HIDALGO NAINSKY CABRERA,

Appellant

_____

On Appeal from the United States District Court
for the District of Delaware
(Crim. No. 1-11-cr-00117-001)
District Judge: Gregory M. Sleet

Submitted Under Third Circuit LAR 34.1(a)
February 8, 2016

BEFORE: FUENTES, KRAUSE, and RENDELL, *Circuit Judges*

(Opinion Filed: June 9, 2016)
_____

OPINION[*]
_____

Fuentes, *Circuit Judge.*

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

Defendant, Hidalgo Cabrera, appeals the District Court's denial of his motion to suppress certain physical evidence, arguing that the evidence was obtained in violation of his Fourth Amendment rights. For the following reasons, we will affirm.

## I. BACKGROUND[1]

This case involves the often controversial use of Global Positioning System (GPS) technology by law enforcement to covertly track suspects without a warrant. Juan Rodriguez and Hidalgo Cabrera were the subjects of two separate investigations by federal and state authorities into their efforts to traffic cocaine between New York and Delaware. Sometime in May 2011, the DEA received information from a confidential informant suggesting that Rodriguez was heavily involved in narcotics trafficking. For instance, the informant described how Rodriguez had charged him a certain amount per kilogram of cocaine, the means by which Rodriguez distributed his cocaine, and the phone numbers and vehicles that Rodriguez used. The informant also said that Rodriguez drove a Dodge Ram pickup truck, which contained a hidden compartment. On one occasion, officers conducted a traffic stop and confirmed that the driver of the pickup identified by the informant was indeed Rodriguez.

Another investigation took place in Delaware. Authorities had been monitoring a drug-trafficking organization in which they believed that Cabrera was involved. To that end, Detective Ronald Marzec of the Delaware Police Department had identified two

---

[1] The District Court had subject matter jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291.

apartments – units 1407 and 4807 – at the Christiana Meadows apartment complex as being somehow associated with Cabrera's organization.

Based on this and other information, Special Agent Hall received approval from his DEA supervisor, the DEA Assistant Special Agent in Charge, and an Assistant U.S. Attorney for the District of New Jersey to install a GPS tracking device on Rodriguez's Dodge Ram pickup truck. He did not obtain a warrant to do so. The device was installed by an IT specialist while the truck was parked on a public street in New York. After monitoring the truck's activity over the course of several months, Agent Hall noticed that it was frequently traveling between New York and Delaware, staying in Delaware for less than an hour and then returning to New York. This was consistent with the information provided by the informant, who told investigators that Rodriguez frequently traveled out of state to conduct narcotics transactions.

On one occasion, Agent Hall received a phone call from the DEA, which informed him that the tracking device on the Dodge Ram had crossed the Verrazano Bridge, traveling towards Delaware. Agents followed the truck to a furniture store parking lot in Newark, Delaware. Rodriguez was seen getting out of his truck, at which time he looked at a Toyota Corolla parked nearby. Shortly after, Cabrera was seen leaving the Corolla and getting into Rodriguez's truck. Moments later, Cabrera got out of the truck and returned to the Corolla with a plastic bag. The truck and the Corolla then left the parking lot. The police followed the Corolla out of the parking lot and pulled the vehicle over for failure to signal a lane change. Following a search, to which Cabrera consented, officers seized $20,000 or $30,000 in cash from Cabrera. Cabrera was not taken into custody but

3

agreed to follow the police to the Delaware State Police office. There, a drug-sniffing dog detected the odor of controlled substances around the money. At the police station, Cabrera was observed by one officer to be distraught, speaking on his cell phone. There were no significant developments in the investigation until Rodriguez's truck was identified several weeks later crossing the Verrazano Bridge en route to Delaware once again.

DEA agents and the Delaware police followed Rodriguez to the Christiana Mall parking lot. Officers observed Rodriguez exit the vehicle and enter a Macy's department store and then exit a short while later with Cabrera. Both men got into Rodriguez's truck and drove off. The agents followed the truck to the nearby Christiana Meadows apartment complex. Detective Marzec told the agents that they should check the 4800 building. There, they found the truck parked in front of the building. After about 20 minutes, Cabrera and Rodriguez were then seen leaving the building, and Rodriguez was carrying a duffel bag. Rodriguez entered the driver's seat of the Dodge Ram while Cabrera entered the passenger seat.

The two men drove back towards the Christiana Mall, and federal agents and local police followed. The police then stopped the truck in the parking lot on the ground that the vehicle's window tint was too dark. Following a search of the truck with Rodriguez's consent and with the help of a drug-sniffing dog, police found several kilograms of cocaine in the truck's secret compartment. Rodriguez and Cabrera were arrested.

At the DEA Office in Wilmington, Cabrera consented to a search of his residence located at 1407 Christiana Meadows. After his arrest, the police also discovered a set of

4

keys on Cabrera's person, one of which was associated with apartment 4807. The DEA and Delaware police thereafter went to the apartment complex. When they arrived at unit 1407, they encountered Cabrera's girlfriend, who also consented to a search of the apartment. Once inside, agents seized $10,000 and a shoe box containing rubber bands and finger moisturizer. They did not locate any drugs or other contraband in the apartment. The agents also went to unit 4807. Before entering, they swept the grounds with a drug-sniffing dog, which alerted them to narcotics in the area of the apartment. Police then obtained a search warrant for the apartment. After executing the warrant, they discovered money on the kitchen counter and two duffel bags, one in a bedroom and one in the laundry room. Combined, the duffel bags contained 19 kilograms of cocaine.

Cabrera and Rodriguez were thereafter indicted in United States District Court for the District of Delaware and convicted on one count of conspiracy to possess a controlled substance with intent to distribute and one count of possession with intent to distribute the same. Before the District Court, Cabrera moved to suppress the evidence obtained from the vehicle. The District Court denied the motion. Cabrera eventually pled guilty to Count One of the indictment, charging conspiracy to possess with intent to distribute 5000 grams or more of cocaine in violation of 21 U.S.C. § 846. In his memorandum of plea agreement, however, he reserved the right to appeal the denial of his motion to suppress. Here, Cabrera argues that DEA agents acted in bad faith when they used a GPS tracking device without a warrant to monitor the truck's activity. Cabrera also argues that the District Court erroneously concluded that he did not have standing to challenge the various searches.

5

## II. DISCUSSION

Cabrera argues that the District Court erred by concluding that he lacked standing to challenge the installation and use of the GPS tracker to monitor the Dodge Ram's movements over the course of the investigation, and the search of the Dodge Ram pickup truck that followed a traffic stop and was aided by the use of the GPS tracker. He also challenges the searches of apartments 4807 and 1407 at Christiana Meadows and the search of his person after his arrest as fruits of the installation of the GPS tracker and the traffic stop.[2] We discern no error in the District Court's conclusions.

We first address Cabrera's contention that he has standing to challenge the search of the installation of the GPS device. Two months after Cabrera's arrest, the Supreme Court issued an opinion in *United States v. Jones*, 132 S. Ct. 945 (2012). In *Jones*, the Court affirmed the suppression of location data generated by a GPS tracking device that law enforcement secretly affixed to a defendant's vehicle and monitored, continuously,

---

[2] Cabrera argues in his brief that he has standing to challenge the searches of his residence and of his person. The District Court, however, never concluded otherwise, and in any event, we see no error in the District Court's conclusions that the search of his residence was consented to, *see Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990), and that the search of his person was a lawful search incident to arrest, *see Chimel v. California*, 395 U.S. 752, 762-63 (1969).

As for the search of apartment 4807, the District Court did not err in finding that Cabrera lacks standing to challenge the search. The mere fact that he had a key to the apartment is insufficient to support either that Cabrera had a property interest or a reasonable expectation of privacy in the apartment, especially given that Cabrera specifically identified apartment 1407, and not apartment 4807, as his home and that the evidence strongly suggests that unit 4807 was used solely for purposes of facilitating the drug trafficking operation.

over a 28-day period without a warrant.[3]   In doing so, the Court concluded that the installation of the GPS device and the monitoring of the vehicle constituted a "search" under the Fourth Amendment because it involved a trespass on a protected property interest in the vehicle.[4]   The majority's reasoning in *Jones* was thus rooted in private property rights and common-law trespass.[5]

In *United States v. Katzin*, 769 F.3d 163 (3d Cir. 2014), an *en banc* decision from our Court that was issued after the Supreme Court's decision in *Jones*, we concluded – on very similar facts – that the exclusionary rule did not apply to evidence obtained as a result of GPS tracking, as a reasonable agent would have believed in good faith that the use of a GPS device without a warrant was lawful prior to the *Jones* decision.[6] Other courts have also tackled the tension between pre-*Jones* decision warrantless GPS searches and the Fourth Amendment's protections.  Many of those courts have concluded that the good-faith exception would apply even if the searches were unconstitutional.[7] And, moreover, certain courts that have found a warrant was required for GPS tracking prior to *Jones* have typically reached that conclusion by rejecting the government's

---

[3] *Jones*, 132 S. Ct. at 948-54.

[4] *Id.* at 949.

[5] *See United States v. Perea-Rey*, 680 F.3d 1179, 1185 (9th Cir. 2012) (citing *Jones*, 132 S. Ct. at 949).

[6] *Id.* at 176-77.

[7] *E.g.*, *United States v. Andres*, 703 F.3d 828, 834–35 (5th Cir. 2013); *United States v. Pineda–Moreno*, 688 F.3d 1087, 1090 (9th Cir. 2012).

attempts to fit GPS tracking within the Fourth Amendment's automobile exception.[8] Some have also broadly considered the balance of privacy and governmental interests at stake, concluding that the scales tip in favor of requiring a warrant.[9]

In light of these decisions, we first agree with the District Court's conclusion that Cabrera lacked standing to challenge the installation of the GPS tracker to monitor the Dodge Ram's movements. It is clear that Cabrera was a mere passenger in the vehicle and had no protected property interest in it when the GPS device was installed or at any time thereafter.[10] He therefore lacks standing to challenge the installation of the GPS device.

Moreover, even if we were to find that Cabrera had standing to challenge the GPS installation, we would conclude, as we did in *Katzin*, that the utilization of the device was reasonable in these circumstances under the good-faith exception to the Fourth Amendment's protections. Because *Jones* had not yet been decided and there was no other binding precedent to suggest that a warrant was required before installing the device, Special Agent Hall obtained and reasonably relied on his supervisor's approval when his application for use of the GPS was approved and the tracker was placed on the vehicle. We also find it to be persuasive that the confidential informant had already

---

[8] *See United States v. Ortiz*, 878 F. Supp. 2d 515, 535–36 (E.D. Pa. 2012).

[9] *See United States v. Ford*, No. 11–CR–42, 2012 WL 5366049, at *8 (E.D. Tenn. Oct. 30, 2012); *see also Jones*, 132 S. Ct. at 955 (Sotomayor, J., concurring) (emphasizing the impact that GPS monitoring can have on a person's privacy); *United States v. Maynard*, 615 F.3d 544, 562 (D.C. Cir. 2010) (same).

[10] *See Katzin*, 769 F.3d at 170.

8

identified the driver of the Dodge Ram as Rodriguez after his initial traffic stop. Moreover, authorities had obtained other information suggesting that Rodriguez was using to the truck to traffic drugs. Thus, while these points are not dispositive to our decision, we believe that the officers acted in good faith.

We also find no merit in Cabrera's contention that the traffic stop was illegal, as we agree with the District Court's additional conclusion that the Delaware State Police had an independent basis for concluding that the tint on the pickup truck violated Section 4313(a) of the Delaware Motor Vehicle Code.[11] Having found that Cabrera lacks standing to challenge the installation of the GPS device or the stop of the Dodge Ram, we also find that his challenges to the fruits of these searches are unavailing.

## III. CONCLUSION

For substantially the same reasons set forth in the District Court's thorough and persuasive opinion, we will affirm the judgment of the District Court.

---

[11] When a vehicle is illegally stopped, passengers do have standing to object to the stop itself, and "may seek to suppress the evidentiary fruits of that illegal seizure under the fruit of the poisonous tree doctrine." *United States v. Mosley*, 454 F.3d 249, 253 (2006).